Daniel Sadeh, Esq.
**HALPER SADEH LLP**
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| KENNETH DAVIS,<br><br>       Plaintiff,<br><br>    v.<br><br>AIMMUNE THERAPEUTICS, INC.,<br>JAYSON DALLAS, GREG BEHAR,<br>PATRICK ENRIGHT, KATE FALBERG,<br>BRETT HAUMANN, MARK IWICKI,<br>MARK MCDADE, and STACEY D.<br>SELTZER,<br><br>       Defendants. | Case No:<br><br><br>JURY TRIAL DEMANDED |

## COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Kenneth Davis ("Plaintiff"), by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys.

### NATURE OF THE ACTION

1.     This is an action against Aimmune Therapeutics, Inc. ("Aimmune" or the "Company") and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(e), 14(d)(4), and 20(a) of the Securities Exchange Act of 1934 (the

1

"Exchange Act"), 15 U.S.C. §§ 78n(e), 78n(d)(4), and 78t(a), and Rule 14d-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14d-9, in connection with the proposed acquisition (the "Proposed Transaction") of Aimmune by SPN MergerSub, Inc. ("Merger Sub"), a direct wholly owned subsidiary of Société des Produits Nestlé S.A. ("Parent" or "Nestlé").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 14(e), 14(d)(4), and 20(a) of the Exchange Act (15 U.S.C. §§ 78n(e), 78n(d)(4), and 78t(a)) and Rule 14d-9 promulgated thereunder by the SEC (17 C.F.R. § 240.14d-9).

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as a substantial portion of the transactions and wrongs complained of herein had an effect in this District, the alleged misstatements entered and the subsequent damages occurred in this District, and the Company conducts business in New York.[1]

5. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6. Plaintiff is, and has been at all relevant times hereto, an owner of Aimmune common stock.

---

[1] For example, in 2019, the Company reportedly participated in a conference that was held in New York City. *See* Aimmune, *Investor Overview*, https://ir.aimmune.com/investor-overview?page=4 (last visited Sept. 23, 2020).

7. Defendant Aimmune is a clinical-stage biopharmaceutical company that develops and commercializes product candidates for the treatment of peanut and other food allergies. The Company is incorporated in Delaware. The Company's common stock trades on the NASDAQ Global Select Market under the ticker symbol, "AIMT."

8. Defendant Jayson Dallas ("Dallas") is Chief Executive Officer ("CEO"), President, and a director of the Company.

9. Defendant Greg Behar ("Behar") is a director of the Company and CEO of Nestlé Health Science, a global business unit of Nestlé S.A. Parent nominated Defendant Behar to serve as a director on the Board.

10. Defendant Patrick Enright ("Enright") is a director of the Company.

11. Defendant Kate Falberg ("Falberg") is a director of the Company.

12. Defendant Brett Haumann ("Haumann") is a director of the Company.

13. Defendant Mark Iwicki ("Iwicki") is a director of the Company.

14. Defendant Mark McDade ("McDade") is Chairman of the Board of the Company.

15. Defendant Stacey D. Seltzer ("Seltzer") is a director of the Company.

16. Defendants Dallas, Behar, Enright, Falberg, Haumann, Iwicki, McDade, and Seltzer are collectively referred to herein as the "Individual Defendants."

17. Defendants Aimmune and the Individual Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A. Background of the Company

18. Aimmune is a biopharmaceutical company focused on developing and commercializing proprietary product candidates for the treatment of peanut and other food

3

allergies. Aimmune's main therapeutic approach, referred to as Characterized Oral Desensitization Immunotherapy, or CODIT™, is designed to desensitize patients to food allergens and thereby reduce the risk of having an allergic reaction upon accidental exposure or reduce symptom severity should an allergic reaction occur.

19. PALFORZIA ™ (formerly AR101), Aimmune's lead internally developed product utilizing CODIT, is an oral immunotherapy indicated for the mitigation of allergic reactions, including anaphylaxis, that may occur with exposure to peanuts.

20. Aimmune is also developing additional CODIT product candidates for the treatment of egg allergies and multi-tree nut allergies.

21. In November 2016, Aimmune entered into a two-year strategic collaboration with "Nestec Ltd., which has since been merged with and into Nestlé, for the advancement of food allergy therapeutics." As part of this collaboration, Aimmune sold to Nestlé Health Science US Holdings, Inc. (together with Nestlé and its affiliates that comprise the Nestlé Health Science division of Nestlé S.A., "Nestlé Health Science") 7,552,084 shares of the Company representing approximately 15.1% of Aimmune's outstanding shares as of November 23, 2016. The sale was at a price of $19.20 per share for aggregate consideration of $145 million. Pursuant to the terms of the collaboration, Nestlé Health Science designated Defendant Behar to the Board. Defendant Behar joined the Board in November 2016.

22. Since November 2016, Nestlé Health Science has increased its equity ownership interest in Aimmune.

23. In February 2018, Nestlé Health Science acquired an additional 937,500 Aimmune shares at a price of $32.00 per share for aggregate consideration of $30.0 million.

24. In November 2018, Aimmune entered into an extension of the strategic

4

collaboration and issued and sold to Nestlé Health Science an additional 3,237,529 shares in a private placement at a price of $30.27 per share for an aggregate consideration of $98.0 million, increasing Nestlé Health Science's percentage equity ownership interest in Aimmune to approximately 19% of Aimmune's then outstanding shares as of November 11, 2018.

25. On January 31, 2020, Aimmune announced that the U.S. Food and Drug Administration (the "FDA") approved PALFORZIA for marketing and sale in the United States. PALFORZIA is the first approved treatment for patients with peanut allergy. On this news, Aimmune's stock price rose $1.96 per share or over 6% to close at $33.01 per share on February 3, 2020.

26. In February 2020, Aimmune announced an additional $200 million equity investment by Nestlé Health. Nestlé and its affiliates currently own approximately 19% of Aimmune's common stock.

27. In March 2020, the World Health Organization declared that the COVID-19 outbreak was a pandemic. As Aimmune would report in its Form 10-Q filed with the SEC on May 11, 2020, its operations were significantly impacted by the pandemic, including with respect to the commercial launch of PALFORZIA and enrollment in its Phase 2 clinical trial for AR201 for treatment of hen egg allergy. Nonetheless, Aimmune experienced success in the ensuing months of 2020.

28. For example, on March 16, 2020, Aimmune issued a press release announcing that children with peanut allergies were already being treated with PALFORZIA just six weeks after FDA approval. Defendant CEO Dallas commented that Aimmune's preparedness and functional U.S.-based supply chain was contributing to a successful rollout. The press release states, in relevant part:

"We are pleased that peanut-allergic children are being treated with PALFORZIA just six weeks after its FDA approval. Our anticipation of and preparedness for the REMS program allowed for a swift and smooth implementation of those requirements. In addition, our U.S.-based supply chain remains fully operational and commercial supply is available," said Jayson Dallas, M.D., President and CEO of Aimmune. "Since our REMS website went live on February 21, well over 600 allergists are certified and ready to prescribe PALFORZIA to their patients. Our field team is continuing to meet with allergists to provide direction and information on the REMS process to help additional physicians and practices become certified and provide training on how to safely incorporate PALFORZIA into their practices."

29. On June 8, 2020, Aimmune issued a press release announcing new findings from a phase 3 trial demonstrating that patients with peanut allergy aged 4 through 17 were "highly satisfied after nine months of daily treatment with PALFORZIA[.]" According to the press release, the findings revealed that patients were confident that the treatment was (i) effective, (ii) convenient to incorporate into their daily lives, and (iii) easy to administer.

30. But on August 31, 2020, Aimmune issued a press release announcing that it had entered into a definitive agreement for Nestlé to acquire Aimmune for $34.50 per share in an all-cash transaction. The press release states, in pertinent part:

> **Aimmune Therapeutics Enters Definitive Agreement with Sociétés des Produits Nestlé S.A., Part of Nestlé Health Science**
>
> - Sociétés des Produits Nestlé S.A., part of Nestlé Health Science, to acquire Aimmune for $34.50 per share in cash, representing a total equity value of $2.6 Billion and a 174% premium to Aimmune's closing price on August 28, 2020
> - Aimmune's PALFORZIA® [Peanut (*Arachis hypogaea*) Allergen Powder-dnfp] is the world's first approved treatment for peanut allergy
> - Transaction expected to be completed in the fourth quarter of 2020

August 31, 2020 01:15 AM Eastern Daylight Time

BRISBANE, Calif.--(BUSINESS WIRE)--Aimmune Therapeutics Inc. (Nasdaq: AIMT), a biopharmaceutical company developing and commercializing treatments for potentially life-threatening food allergies, today announced that it has entered into a definitive agreement for Sociétés des Produits Nestlé, S.A. to acquire Aimmune for $34.50 per share in an all-cash transaction, implying a fully-diluted

equity value of $2.6 billion. Sociétés des Produits Nestlé, S.A. is a part of Nestlé Health Science (NHSc) and a wholly owned subsidiary of Nestlé S.A. The agreement was unanimously approved by all of the independent members of the Board of Directors of Aimmune. Greg Behar, CEO of Nestlé Health Sciences and an Aimmune Director, abstained due to his position with Nestlé Health Science.

"The agreement with Nestlé recognizes the value created by years of commitment and dedication to our mission by the team at Aimmune. Delivering PALFORZIA, the world's first treatment for food allergy, is a game-changing proposition in the biopharmaceutical industry and is transformative for the lives of millions of people living with potentially life-threatening peanut allergy," said Jayson Dallas, MD, President and Chief Executive Officer of Aimmune. "This acquisition provides strong value for our shareholders and ensures a level of support for PALFORZIA and our pipeline that will further enhance their potential for patients around the world living with food allergies. Aimmune appreciates the continued strong collaboration with Nestlé Health Science dating back to 2016 through their support as a shareholder and board member, as well as through their consumer/nutrition strength and experience. Their extensive capabilities and global reach, as well as their alignment with our vision of pioneering treatments and solutions for food allergies, are a strong fit for our company."

"This transaction brings together Nestlé's nutritional science leadership with one of the most innovative companies in food allergy treatment," said Nestlé Health Science CEO Greg Behar. "Together, we will be able to create a world leader in food allergy prevention and treatment and offer a wide range of solutions that can transform the lives of people around the world living with food allergies."

The transaction is expected to close in the fourth quarter of 2020, pending the satisfaction of all conditions to the completion of the tender offer. Until that time, Aimmune will continue to operate as a separate and independent company.

Aimmune's financial advisors are J.P. Morgan Securities LLC and Lazard. Latham & Watkins LLP is acting as legal counsel for Aimmune.

**Transaction Details**

Under the terms of the merger agreement, Nestlé S.A.'s wholly-owned subsidiary, Société des Produits Nestlé S.A. (SPN), will commence a cash tender offer to acquire all outstanding shares of Aimmune common stock that are not already owned by NHSc for $34.50 per share in cash, and Aimmune agreed to file a recommendation statement containing the unanimous recommendation of the independent members of the Aimmune board that Aimmune stockholders tender their shares to SPN. Following the completion of the tender offer, Nestlé expects to promptly consummate a merger of Aimmune with a subsidiary of SPN, in which shares of Aimmune that have not been tendered in the tender offer will be acquired

by SPN and converted into the right to receive the same cash price per share as paid in the tender offer.

The closing of the tender offer is subject to customary closing conditions, including the tender of a majority of outstanding Aimmune shares on a fully diluted basis which shall include the shares of Aimmune common stock currently held by Nestlé and its affiliates and the expiration or termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act and antitrust approvals in Germany. The merger agreement includes customary termination provisions for both Aimmune and Nestlé.

**INDICATION**

PALFORZIA is an oral immunotherapy indicated for the mitigation of allergic reactions, including anaphylaxis, that may occur with accidental exposure to peanut. PALFORZIA is approved for use in patients with a confirmed diagnosis of peanut allergy. Initial Dose Escalation may be administered to patients aged 4 through 17 years. Up-Dosing and Maintenance may be continued in patients 4 years of age and older.

PALFORZIA is to be used in conjunction with a peanut-avoidant diet.

Limitations of Use: Not indicated for the emergency treatment of allergic reactions, including anaphylaxis.

\*     \*     \*

**About Aimmune**

Aimmune Therapeutics, Inc. is a biopharmaceutical company developing and commercializing treatments for potentially life-threatening food allergies. With a mission to improve the lives of people with food allergies, Aimmune is developing and commercializing oral treatments for potentially life-threatening food allergies. The Company's Characterized Oral Desensitization ImmunoTherapy (CODIT™) approach is intended to provide meaningful levels of protection against allergic reactions resulting from accidental exposure to food allergens by desensitizing patients with defined, precise amounts of key allergens. Aimmune has one FDA-approved medicine for peanut allergy and other investigational therapies in development to treat other food allergies. For more information, please visit www.aimmune.com.

31.     The consummation of the Proposed Transaction would prevent current Aimmune shareholders from participating in Aimmune's strong growth prospects.

32.     Indeed, on August 31, 2020, a Fierce Pharma article by Kyle Blankenship noted

8

that Nestlé's $34.50 per share offer to acquire Aimmune—which includes PALFORZIA with its "blockbuster aspirations as the only approved peanut allergy therapy on the market"—could prove to be a "steal" considering how PALFORZIA had been "stricken with slow uptake given widespread lockdowns around COVID-19[.]" The article states, in relevant part:

> The pact will merge Aimmune into an existing Nestlé subsidiary, forming a standalone business unit under the Aimunne moniker. The deal is expected to close in the fourth quarter.
>
> Bringing Aimmune on board will add some heft to Nestlé's health sciences unit, launched in 2011, and its food allergy portfolio. Palforzia has blockbuster aspirations as the only approved peanut allergy therapy on the market, with Evaluate Pharma pegging its 2024 sales at roughly $1.28 billion.
>
> \*   \*   \*
>
> Early in its launch, Palforzia has been stricken with slow uptake given widespread lockdowns around COVID-19, Piper Sandler analysts wrote in a note to clients after the deal was announced. However, once allergy clinics start running at full speed, Palforzia could make the Nestlé's rich premium look like a steal in the long run.
>
> "While we understand the uncertainty that COV(ID)-19 disruption presents, we also think as pandemic-related disruption recedes and Palforzia's true demand begins to manifest, it will be deemed that Nestle got itself a bargain here," the analysts wrote.

33. On September 14, 2020, the Company filed a Schedule 14D-9 Solicitation/Recommendation Statement under Section 14(d)(4) of the Exchange Act (the "Solicitation Statement") with the SEC in connection with the Proposed Transaction.

**B. The Solicitation Statement Contains Materially False and Misleading Statements and Omissions**

34. The Solicitation Statement, which recommends that Aimmune shareholders tender their shares to Merger Sub in connection with the Proposed Transaction, omits and/or misrepresents material information concerning: (i) the Company's financial projections; (ii) the financial analyses performed by the Company's financial advisors, J.P. Morgan Securities LLC ("J.P. Morgan") and Lazard Frères & Co. LLC ("Lazard"), in connection with their fairness

9

opinions; and (iii) potential conflicts of interest involving Lazard.

35. The omission of the material information (referenced below) renders the following sections of the Solicitation Statement false and misleading, among others: (i) Reasons for the Recommendation of the Company Board; (ii) Company Management's Unaudited Prospective Financial Information; and (iii) Opinions of the Company's Financial Advisors.

36. The tender offer in connection with the Proposed Transaction is set to expire at 12:00 midnight, Eastern time, on October 9, 2020 (the "Expiration Date"). It is imperative that the material information that was omitted from the Solicitation Statement be disclosed to the Company's shareholders prior to the Expiration Date to enable them to make an informed decision as to whether to tender their shares. Plaintiff may seek to enjoin Defendants from closing the tender offer or the Proposed Transaction unless and until the material misstatements and omissions (referenced below) are remedied. In the event the Proposed Transaction is consummated, Plaintiff may seek to recover damages resulting from Defendants' misconduct.

### 1. Material Omissions Concerning the Company's Financial Projections

37. The Solicitation Statement omits material information concerning the Company's financial projections.

38. In connection with the Proposed Transaction, the "Company's management prepared probability-adjusted profit and loss projections regarding the Company on a standalone basis for fiscal years 2020 through calendar year 2035" (the "Company Management Projections"). *See* Solicitation Statement at 45-46.

39. With respect to the Company Management Projections, the Solicitation Statement fails to disclose: (1) all line items underlying (i) Total Revenue, (ii) EBIT, and (iii) Unlevered Free Cash Flow; and (2) a reconciliation of all non-GAAP to GAAP metrics.

40. Further, the Solicitation Statement provides that the Company created financial

projections for fiscal years 2020 through calendar year 2030 reflecting the "significant uncertainty surrounding the impact of COVID-19 on PALFORZIA and the uncertainties inherent in the Company's pipeline." The Solicitation Statement states, in pertinent part:

> Before creating the Company Management Projections, Company management prepared certain unaudited prospective financial information regarding the Company on a stand-alone basis for fiscal years 2020 through calendar year 2030 (the "Early Long-Term Projections"), reflecting the significant uncertainty surrounding the impact of COVID-19 on PALFORZIA and the uncertainties inherent in the Company's pipeline. . . . In creating the Early Long-Term Projections, Company management made various assumptions, including the impact of COVID-19 on PALFORZIA, the probability of success of the Company's product candidates, timing for clinical trial completion and commercial launch, as well as estimated operational costs, including sales & marketing, research & development, manufacturing, and general & administrative, and other market and financial conditions and other future events, the results of which are reflected in the tables below.

*See* Solicitation Statement at 46-57.

41. Yet the Solicitation Statement fails to adequately disclose the impact that the assumptions had on the Early Long-Term Projections and further fails to quantify the assumptions underlying the projections, including "the impact of COVID-19 on PALFORZIA, the probability of success of the Company's product candidates, timing for clinical trial completion and commercial launch, as well as estimated operational costs, including sales & marketing, research & development, manufacturing, and general & administrative, and other market and financial conditions and other future events[.]" The Solicitation Statement further fails to disclose the unadjusted projections (without adjusting for the assumptions) so shareholders can properly assess and determine the financial impact that the Company's assumptions had on the projections.

42. With respect to the Early Long-Term Projections, the Solicitation Statement fails to disclose all line items underlying (i) Total Revenue, (ii) Operating Income, and (iii) Net Income.

43. The disclosure of this information is material because it would provide the

11

Company's shareholders with a basis to project the future financial performance of the Company and would allow shareholders to better understand the financial analyses performed by the Company's financial advisors in support of their fairness opinions. Shareholders cannot hope to replicate management's inside view of the future prospects of the Company. Without such information, which is uniquely possessed by Defendant(s) and the Company's financial advisors, the Company's shareholders are unable to determine how much weight, if any, to place on the Company's financial advisors' fairness opinions in determining whether to tender their shares in connection with the Proposed Transaction.

44. When a company discloses non-GAAP financial metrics in a Solicitation Statement that were relied upon by its board of directors in recommending that shareholders exercise their corporate suffrage rights in a particular manner, the company must also disclose, pursuant to SEC Regulation G, all projections and information necessary to make the non-GAAP metrics not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial metrics disclosed or released with the most comparable financial metrics calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.[2]

45. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

---

[2] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html (footnotes omitted) (last visited Sept. 23, 2020) ("And last month, the staff issued guidance addressing a number of troublesome practices which can make non-GAAP disclosures misleading: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.").

**2. Material Omissions Concerning the Financial Advisors' Analyses**

46. In connection with the Proposed Transaction, the Solicitation Statement omits material information concerning analyses performed by J.P. Morgan and Lazard.

47. The valuation methods, underlying assumptions, and key inputs used by J.P. Morgan and Lazard in rendering their purported fairness opinions must be fairly disclosed to Aimmune shareholders. The description of J.P. Morgan's and Lazard's fairness opinions and analyses, however, fail to include key inputs and assumptions underlying those analyses. Without the information described below, Aimmune shareholders are unable to fully understand J.P. Morgan's and Lazard's fairness opinions and analyses, and are thus unable to determine how much weight, if any, to place on them in determining whether to tender their shares in connection with the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to Aimmune shareholders.

**A.** *J.P. Morgan's Analyses*

48. The Solicitation Statement fails to disclose the following concerning J.P. Morgan's "*Discounted Cash Flow Analysis*": (1) all line items used to calculate the unlevered free cash flow that the Company is expected to generate during calendar years 2020 through 2035; (2) the range of terminal values for the Company; (3) the individual inputs and assumptions underlying the perpetual growth rates ranging from negative 40% to negative 20% and discount rates ranging from 10.0% to 14.0%; (4) the Company's net cash as of June 30, 2020; and (5) the number of fully diluted shares of the Company.

**B.** *Lazard's Analyses*

49. The Solicitation Statement fails to disclose the following concerning Lazard's "*Discounted Cash Flow Analysis*": (1) the estimated probability-adjusted, after-tax unlevered free cash flows to be generated by the Company from September 30, 2020 through the end of the

terminal year of 2035, and all underlying line items; (2) the range of terminal values for the Company; (3) the individual inputs and assumptions underlying the discount rates ranging from 10.0% to 12.0% and "negative terminal growth rate range of (40%) – (20%)"; (4) the estimated net cash of the Company at September 30, 2020; (5) the range of total equity values for the Company; and (6) the number of fully diluted shares of the Company.

50. With respect to Lazard's "*Selected Public Companies Analysis*" and "*Selected Precedent Transactions Analysis*," the Solicitation Statement fails to disclose the individual multiples and financial metrics for the companies and transactions observed by Lazard in its analyses.

51. With respect to Lazard's "*Premia Paid Analysis*," the Solicitation Statement fails to disclose each transaction and the individual premiums paid therein.

52. With respect to Lazard's "*Research Analyst Price Targets*," the Solicitation Statement fails to provide the individual price targets analyzed and the sources thereof.

### 3. Material Omissions Concerning Potential Conflicts of Interest Involving Lazard

53. The Solicitation Statement omits material information concerning potential conflicts of interest involving Lazard.

54. The Solicitation Statement provides that "Lazard has in the two years prior to the delivery of its opinion on August 28, 2020 provided certain investment banking services to L'Oréal S.A. or its subsidiaries, which are affiliates of Parent, for which Lazard has received and may receive compensation."

55. The Solicitation Statement, however, fails to adequately disclose the timing and nature of all past services Lazard provided to the Company, Parent, and their respective affiliates (including L'Oréal S.A. or its subsidiaries) and the compensation it received or expects to receive

for providing such services.

56. Disclosure of a financial advisor's compensation and potential conflicts of interest to shareholders is required due to their central role in the evaluation, exploration, selection, and implementation of strategic alternatives and the rendering of any fairness opinions. Disclosure of a financial advisor's potential conflicts of interest may inform shareholders on how much weight to place on that analysis.

57. The omission of the above-referenced information renders the Solicitation Statement materially incomplete and misleading. This information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

## COUNT I
### For Violations of Section 14(e) of the Exchange Act
### Against All Defendants

58. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

59. Section 14(e) of the Exchange Act states, in relevant part:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . in connection with any tender offer or request or invitation for tenders[.]

60. During the relevant period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and misleading Solicitation Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 14(e) of the Exchange Act.

61. Each of the Individual Defendants, by virtue of their positions within the Company as officers and/or directors, were aware of materially false and/or misleading and/or omitted

information but failed to disclose such information, in violation of Section 14(e) of the Exchange Act. Defendants, by use of the mails and means and instrumentalities of interstate commerce, solicited and/or permitted the use of their names to file and disseminate the Solicitation Statement with respect to the Proposed Transaction.

62. The false and misleading statements and omissions in the Solicitation Statement are material in that a reasonable shareholder would consider them important in deciding whether to tender their shares in connection with the Proposed Transaction.

63. Defendants acted knowingly or with deliberate recklessness in filing or causing the filing of the materially false and misleading Solicitation Statement.

64. By reason of the foregoing, Defendants violated Section 14(e) of the Exchange Act.

65. Because of the false and misleading statements in the Solicitation Statement, Plaintiff is threatened with irreparable harm.

## COUNT II
### For Violations of Section 14(d)(4) of the Exchange Act and Rule 14d-9 Promulgated Thereunder
### Against All Defendants

66. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

67. Defendants caused the Solicitation Statement to be issued with the intent to solicit shareholder support for the Proposed Transaction.

68. Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers. Specifically, Section 14(d)(4) states, in relevant part:

> Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

69. SEC Rule 14d-9(d), adopted to implement Section 14(d)(4) of the Exchange Act, states, in relevant part:

> Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof[.]

70. In accordance with SEC Rule 14d-9, Item 8 of Schedule 14D-9 requires that a company:

> Furnish such additional material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading.

71. During the relevant period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and misleading Solicitation Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9.

72. Each of the Individual Defendants, by virtue of their positions within the Company as officers and/or directors, were aware of materially false and/or misleading and/or omitted information but failed to disclose such information, in violation of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9. Defendants, by use of the mails and means and instrumentalities of interstate commerce, solicited and/or permitted the use of their names to file and disseminate the Solicitation Statement with respect to the Proposed Transaction.

73. Defendants acted knowingly or with deliberate recklessness in filing the materially false and misleading Solicitation Statement which omitted material information.

74. The false and misleading statements and omissions in the Solicitation Statement are

material in that a reasonable shareholder would consider them important in deciding whether to tender their shares in connection with the Proposed Transaction.

## COUNT III
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

75.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

76.     The Individual Defendants acted as control persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their senior positions as officers and/or directors of the Company and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Solicitation Statement filed with the SEC, they had the power to and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading Solicitation Statement.

77.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Solicitation Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Solicitation Statement, and to correct promptly any public statements issued by the Company which were or had become materially false or misleading.

78.     In particular, each of the Individual Defendants had direct and supervisory involvement in the operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Individual Defendants were provided with or had unlimited

access to copies of the Solicitation Statement and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. The Solicitation Statement at issue contains the recommendation of the Individual Defendants to tender their shares pursuant to the Proposed Transaction. Thus, the Individual Defendants were directly involved in the making of the Solicitation Statement.

79. In addition, as the Solicitation Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Solicitation Statement purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the Individual Defendants.

80. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

81. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Sections 14(e), 14(d)(4), and Rule 14d-9 promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, the Company's shareholders will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and

the tender offer in connection with the Proposed Transaction, unless and until Defendants disclose and disseminate the material information identified above to the Company's shareholders;

B.  In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding Plaintiff rescissory damages;

C.  Declaring that Defendants violated Sections 14(e), 14(d)(4), and 20(a) of the Exchange Act, and Rule 14d-9 promulgated thereunder;

D.  Awarding Plaintiff reasonable costs and expenses incurred in this action, including counsel fees and expenses and expert fees; and

E.  Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 23, 2020              Respectfully submitted,

**HALPER SADEH LLP**

By: /s/ Daniel Sadeh
Daniel Sadeh, Esq.
Zachary Halper, Esq. (to be admitted *pro hac vice*)
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com
       zhalper@halpersadeh.com

*Counsel for Plaintiff*